Next case we have this morning is 23-2010, United States v. Gallegos, I believe. Counsel for Appellant, if you would make your appearance and proceed, please. J.K. Theodosia Johnson on behalf of Mr. Gallegos. The government here played a 16-minute video clip of Mr. Gallegos and the police in a volatile standoff. Within the first few minutes of that video, the police shot Mr. Gallegos, albeit with a less lethal round. And then, in case the jury missed it, the government replayed just that clip. This, more than anything else, shows that that video was not restressed. It was not intrinsic to the assault of Mr. Quiroga, and it simply wasn't relevant to any of the issues. Nor was it, excuse me, allowing 404B, so intrinsic evidence, of course, is related to 404B, the differences between intrinsic and extrinsic, but both should really go to relevancy and the idea that they go to motive or opportunity or intent. And none of the standoff went to that. All it did was show the jury that the police believed he was a dangerous criminal, which then robbed Mr. Gallegos of an impartial jury. Thus, even if it's a res gestae, if it's not, if it's intrinsic, it doesn't necessarily, it's an exception to relevancy. It can be an exception to relevancy if it's intrinsic. Why isn't that? You point out the showing of the video clip as exemplifying why it was not intrinsic. It's not readily apparent to me why that's true. I mean, what you have going on here, at least I think in the government's theory, is a flight situation and a culmination of the flight. And so it is telling the story that took place essentially in real time after the alleged assault on the post officer. And so why isn't it just part of the story of what happened? And so clarify for me, I mean, the fact that they showed the video clip, it's not self-evident to me why that helps you. It has nothing to do even with the flight. It wasn't necessary. We had Sergeant Witten testifying that he saw someone who matched the assailant of Mr. Quiroga in a yellow sweater, blue jeans, half a mile from the assault, within half a mile and within 10 minutes of the assault. And then when he tried to stop him, the man fled. Mr. Witten contested to that. There's no video for that. But then you cannot go on and have the standoff, because the standoff has nothing to do with anything. It's not a culmination of the flight. If he had gotten away, if they had never found him but was later arrested, you still wouldn't get that standoff in. It doesn't change that they supposedly tracked him from yard to yard. Isn't there, isn't the natural question when you're telling the story, and part of the question is the notion that you don't want to leave the jury confused as to what the story is. The natural question is, and so how did you catch him? How did this end? And exhibit A, that's how it ended. Why isn't that a natural way this would play out? Excuse me, Your Honor. I think the exhibit, it ends when he's arrested. You don't need the video of how he's arrested. You just say he was found in Mr. Stank's shed. We arrested him. At some point, he lost a sweater. The testimony as it was given doesn't account for the loss of the sweater already. It's not necessary to complete the story. And even if it was necessary to complete the story, it's far too prejudicial. Having the police shoot our client and then repeatedly tell him that he has to surrender or force is going to be used against him. And then at the very end, say, I paid for you to have an encounter with a police dog, clearly shows that the police believe he's a dangerous criminal. And that even if it is relevant, which I still insist it's not, robbed Mr. Kyorga of a, I'm sorry, Mr. Gallegos, of an impartial jury. I mean, it invited them to make the decision on the fact that he was a scary individual who, according to Sergeant Whitten's testimony, and I do not think that his testimony about why he shot Mr. Gallegos should have been allowed either, was that he was concerned he was going to break into this house in the middle of the day. Let me be clear on one thing. The order that, the motion to eliminate order had certain parts to it. There were like three aspects to it. Correct. Is your challenge just relate to this last incident of how the circumstances under which he was arrested or does it relate to the actual flight itself or what does it, you know, there were three components. There were three and we did argue all three in the brief, but how. There were, what did you just say? I'm sorry. I'm sorry. Yes, we did argue all three in the brief. I understand this court's precedent that the immediate flight is a difficult argument to win. And so we're focusing on the standoff because even if you give us, even if you agree with the flight, that video of the standoff just, it's too prejudicial and it really isn't relevant. The judge said it went to identity as well as rest justice, but it doesn't. The fact that he said his name was Yoshi and he lived there is equally, or more likely because he was trespassing. It went to identity as in 404B identity? Neither the government nor the judge ever raised 404B, but when she made her oral ruling in that pretrial motion, she said it goes to context, it goes to rest justice, it goes to ID, which is an issue in the case. So, well, why doesn't it go to ID when it's him? I mean, that's the guy sitting at the table, at defense table. Why isn't that go to identity when that's what this case is all about? Because once, all you needed for that portion of the identity was that Sergeant Wynton saw someone within half a mile and 15 minutes that matched Mr. Kiorga's description of the assailant and that later on he arrested that same person. The testimony that Sergeant Wynton gave was that the yellow sweater was missing, so that was already gone, so you didn't need the standoff for identification. And when they saw him in that video, he wasn't wearing the yellow sweater, right? Correct. So that corroborates what the officer said was the state of affairs when they found him. In other words, they said he wasn't wearing the yellow sweater when we found him. In the video, he's not wearing the yellow sweater. Why isn't that supportive and why isn't that connected to the earlier testimony? Because you don't need the video for that. You have the photo of Mr. Kiorga immediately after being arrested where he's clearly shirtless. And it doesn't matter what happened to the yellow sweater. It disappeared. And I know you have also the issue of the show up. Yes. And so I don't want to occupy this too long. Let's circle back if we get to it. Do you have anything on the show up? So in eyewitness ID, reliability has to overcome suggestibility. And here it didn't. And the judge didn't make the proper findings to find that it did. Mr. Kiorga was brought to a police-dominated scene, asked immediately if this man was who he saw. And he said yes. Now, Manson versus Manson gives a good example of what the calculus of suggestiveness and reliability should be. It went through the suggestiveness. No, sorry. It went through the reliability factors first that Trooper Glover was within two to three feet of him. It was fairly well lit. It was a two to three-minute conversation. Trooper Glover was trained to make observations that would later lead to an identification. And the description he gave to his co-worker was sufficiently detailed that that man could go and find the photo. And then the court looked at the suggestibility of it. The court looked that he only had one photo and was obviously inclined to, you have no differential things to pick from, so that weighs in favor of suggestibility. But then he noticed that there was no coercive pressure because there was no people in his immediate area, so there was no feeling of coercion. And it also pointed out that he had plenty of time to look at it and reflect and, like, is this really who I saw? And none of that is present here. And importantly, the judge never addresses the difference between how suggestive show-ups are versus, like, a photo array. Show-ups are more suggestive than even biased photo arrays. Well, the court started with the presumption that it was suggestive, and then it applied the, I think it's the Brigger factors, to determine whether, nonetheless, it's admissible, right? She checked the boxes, but she didn't look at it in terms of the suggestiveness. She never looked like, okay, he was wrought, there's only one person, he meets the general description, which the government conceded and the judge found was too generic to support reasonable suspicion. If you cannot stop someone because he looks too much, he looks too generic, especially in Albuquerque, New Mexico, a skinny Hispanic man, you can't then say that description was sufficiently reliable that it overcomes the suggestiveness of a show-up. And if you look at the, if you hear what his description to Sergeant Hitchens was, he says that our guy has an afro and he gestures out to his hat. But then when you look at Mr. Gallegos, he doesn't have an afro. And then when Mr. Gallegos was arrested, you could see that he's wearing mirrored sunglasses. That wasn't mentioned. The distance at which you make Gallegos looked is just so great that it's hard to pick out any identifying characteristics. You have a very generic description that you're told, when he was taken over to this person, he was told this is the guy who assaulted you. He says, yeah, 100%. He repeated the description at least, what, two or three times, right? Yes. And so what do we do with that? Well, it's a generic description. It's internally consistent. Well, the clothes aren't generic. Well, the clothes aren't generic. And the ethnicity is not generic. I mean, it may be New Mexico, but not everybody in New Mexico is Hispanic. Well, correct, but it is the majority. And it's not particularly differentiating in Albuquerque. Before it's too late for me, let me ask you, in your reply brief, if you recall, there was a reference to defense counsel questioning Mr. Carioga about his identification of Mr. Gallegos, indicating that the defense had not taken the identity of Mr. Carioga as assailant from the jury's consideration. This goes toward the admission. There's no citation to the record on that. I couldn't find it. Where is it? I apologize. I don't have that right in front of me. But it's within the first few pages. And then certainly in the jury instruction conference, they talk about the identification. Well, we look real hard. So if you could file a supplemental authority and explain to us where that is, I would be appreciative. All right. But even if she didn't make that specific question, this wasn't a judicial admission. It was not a waiver of the argument because the error was not when it was admitted to trial or not admitted to trial. The error occurred when the show-up ID occurred. And that was what the error was, not that was what the due process error was. So Mr. Carioga was put into a box when they removed the identification from the jury's consideration because he couldn't continue with that, knowing which we know about juries, which is that they confuse certainty with accuracy. And he already said that he was 100 percent certain. And then with the video showing, it took away the intent argument because you think he was really sure. So he was relayed as a dangerous criminal. Fundamentally, Mr. Gallegos was denied a fair trial by the pretrial rulings. I'll reserve the rest of my time. Thanks. Good morning, Your Honors. May it please the Court. My name is Emil Keeney from the U.S. Attorney's Office in Albuquerque. And I'd first like to start out. I think I have the record cite that you were asking for. Great. Judge Holmes. I think you were asking for the where defense counsel asked Mr. Carioga about his difficulty in identifying Mr. Gallegos at the suppression hearing, which occurred a year after. And that's volume three of the record at page 164, 165. She did question him about cross-examine him about that. And what she argued, I'm sorry, that was her closing argument. I'm sorry. That's from her closing argument. Okay. I know she did question him. I agree that she did question him. Well, we'll take it back, and there will be some light shined on that issue at some point. I'm sorry. I thought I had it for you. I appreciate you trying to help the Court. Let me ask you, though, on this whole question of the statements that were made by defense counsel, and whether this issue of identification is actually before us. The defendant framed this as a question of whether this was a judicial admission. Do you acknowledge that framework is what governs here in determining this whole question of whether that information, whether that issue is before us now? I think that's correct. And the reason I didn't say that in my answer brief is, I'm sorry, I just didn't realize there was a name for what I was arguing. You anticipated my next question, and so thank you for that. That was my bad. But I agree with that framework. I think it was a judicial admission, because if you look at the opening brief, the way the facts are phrased, Mr. Quiroga came across a man, and that man pulled a knife on him. And it goes on from there, always referring to the person who committed the assault as a man. Now, it's quite different in counsel's opening statement to the jury. At least ten times she refers to, she's always referring to her client by his first name, Elias. She said Elias was walking down the street. He was walking in front of this postal worker. He knelt down. The postal worker has come up. Elias was startled. Elias was this. Elias thought that. Elias didn't intend anything to do anything wrong. He was just startled. There's no mention anywhere in her opening argument, closing argument, anywhere at trial, that this is an issue, a disputed issue of fact as to who it was with whom Mr. Quiroga interacted that day. But if you acknowledge, and with record sight to be forthcoming, if you acknowledge that, in fact, defense counsel questioned Mr. Quiroga about the identification and the validity of it, why wouldn't that be a sign that, in fact, they were not taking the question of identity off of the table? And why doesn't that bolster the argument of the defendant that it is not a judicial admission? Right, because what she asked him during cross-examination is, isn't it true that at the suppression hearing a year later you had trouble identifying Mr. Gallegos? And he said that was it's because he looked different from when I saw him on that day. And the way she employed that in her closing argument, and that's at 165, Volume 3 of the Record on Appeal. The way she employed that was she employed that along with other discrepancies in the various statements that Mr. Quiroga gave over time and said, look, because there's these discrepancies in his testimony, his perception of Mr. Gallegos' intent was, there's reasonable doubt about his intent. This was a, the whole defense was about intent, not identity. But there was also a jury instruction that told the jury that they had to make the identification. That's right. So wasn't that suggestive? I think that's still an element. I think what, that instruction was added that the parties had proposed their instructions before trial. We had no idea that there was going to be this shift in the defense. Well, wasn't there discussions between the pretrial, between the defense and the prosecution, about a possible stipulation on identity? And the trial court said, I'm sure if you want to enter into that, but then nothing came of it? I'm sorry, I don't remember that, actually. I know I should, but I don't remember it. I don't think I made it up. No, I'm certain you didn't. But the defense, that defense was certainly not off the table before trial began, before defense counsel's opening statement. There was no indication that it was off the table before then. But once she takes it off the table, yes, the district court went on and gave that instruction. I think it was an unnecessarily favorable instruction to the defense, because it suggested, although defense counsel had taken the disputed issue of fact off the table, that it might still be an issue for the jury, even though no one was contending that Mr. Gallegos was not the person with whom Mr. Quiroga interacted that day. So I think if it was an error to give the instruction, it was one that was favorable to the defense. I don't think it's one that resurrected that issue as an actual issue of fact, a disputed issue of fact. Now, one thing the defendant has said in her reply is, well, the jury still had to find that. Of course, I don't disagree with that. The jury had to think that the defendant was the one who committed the crime, sure. But saying that something is an element of the offense is not the same thing as saying it's a disputed issue of fact. Sometimes there are disputed elements of an offense, but we still instruct the jury about those elements. We instruct the jury, but sometimes when there's such a concession, we would instruct the jury that that issue is not, this is an issue, this is an element, but you don't have to decide this. Right. And so that wasn't done here. That's correct. Okay. Let me ask you to pick up where she started, defense counsel. Yes, sir. On the question of the video and the showing of him, the circumstances under which he was detained, and the question being that that was unduly prejudicial and there was no need for that, what's the response to that? Well, I think it's both relevant and not unduly prejudicial. It's relevant because it shows that what the police officer was testifying was correct. He testified that he went into this yard. There's a video of him in the yard. Testified that he's making, officers testified he made efforts to hide himself in a shed. Now, the video doesn't show him coming out of the shed, but it shows the officers discussing, saying he's coming out of the shed. And then explains that he was headed towards the door. This is relevant to show the intensity and extent to which he's trying to go to escape being apprehended. He also, although you can't hear really what Mr. Giygas is saying, at least not too much on the video, you hear Sergeant Witten's responses. He asks him his name, and he says, oh, your name, Yoshi? And then they talk about, oh, you say you live here, and then you hear one of the other officers saying, oh, we're actually over on the other side. I mean, you hear one of the other officers on Sergeant Witten's CD or video, talking about how they're going over to talk with the owner and so forth. So I think it helps to show that what Sergeant Witten is testifying to was correct, and it's relevant because his efforts to escape, his efforts to say that in his lies, saying I live here and this is my name, which are lies, shows his consciousness of guilt. Even if that's true and has probative value, was the video itself more prejudicial than probative because of the intensity and the idea that they had to deploy a nonlethal weapon to arrest him? I mean, you could have done everything you just described by testimony. That's right. And so the question is, was the video itself so graphic and painted the defendant in a light of being a dangerous criminal such that it should have been excluded under 403? No, Your Honor, it shouldn't. It doesn't actually portray him doing anything dangerous. What the officer explains is that the reason I shot is I thought he was going over towards the house. I wanted to prevent him from going inside. We never said or contended he was actually going inside. We don't know that. He was stopped before that. So I think it doesn't suggest any improper basis for a decision. I mean, you can think, though, of situations where the defendant might have done something that would if he had been, say, shouting Nazi or racist slogans or something that was likely to offend a jury and cause him to be distracted from what the issues of the case were, that might have been overly prejudicial. And the district court was sensitive to not—the district court didn't allow the government to play the entire video. She cut it off because at one point he starts asking for an attorney, and she said, no, I don't want the jury to see that. So she's not just saying, whatever happened, I'm just going to show what happened. I don't think there's any—and even if there's a possibility that the jury might form a negative impression of Mr. Gallegos, it's not—the 403 standard is the potential unfair prejudice has to substantially outweigh the prerogative value. And I don't think it outweighs it, and I don't think it's—even if it did, it's not substantial. I don't think the district court abused her discretion in admitting that video. Let me just get your general take on this, and this relates to all of the secondary literature that was put forward, talking—casting doubt on the reliability, if you will, of eyewitness testimony. What do you think we should do with that sort of literature, one? Two, do you—is there anything in there that you are aware of that you flat-out question as being true? And the third question, and I'll repeat them if—the third question relates to specifically this question of certainty and how, in O'Neill, we referenced the notion that certainty doesn't necessarily correlate into accuracy. And so those three things, one, generally, what do you think we should do with that literature? Do you question in any—was there anything that caught your eye that you question as being true about the notion of eyewitness testimony being subject to reliability problems? And three, specifically in this case, shouldn't we look askance at the 100 percent certainty that was articulated by Mr. Kiriaga in light of that secondary literature? Well, the secondary literature, I know this Court looks at secondary literature from time to time. And I think a lot of the—I don't mind you using most of it here because a lot of it, I think, is non-controversial. You know, the idea that someone who—if you're exposed to someone for a longer period of time, you're more likely to be able to identify them. If you're further away, you're less likely, things like that. There was one of the articles that said, look, even a half hour—it was talking about the duration. And there was a quote in there. It was a half hour—over a half hour passes between a crime and an ID. Then it is likely to be unreliable. I pulled that up, and I didn't really see much support for that proposition. And it also said— The idea that you need a half hour? Right, the idea that over a half hour is likely to be unreliable. I think—you know, I don't dispute the general proposition that over length of time, you might have a more difficult time identifying someone. But I'm sorry, what was your second question? Well, you sort of answered the question. The two. The third question specifically related to the whole question of accuracy. And that's sort of a case-specific question here. We have an O'Neill, our case, where we sort of at least hit the pause button on the immediate jump to say when somebody says they're 100% certain, by God, that means it's accurate. And there was some secretary literature here, and there are circuit cases outside of our circuit, which, again, cause one to at least hit the pause button before you jump to the conclusion that because somebody says I'm 100% certain that they're right. I mean, what—do you take issue with that? Or do you acknowledge that when we look at what Ms. Kyriakos said, that that's got to be factored into the whole range of other things and that that is not determinative? It's not determinative, Your Honor. I would agree if you're—I think the gist of what you're saying may be this may be the least important factor. I'm getting at something like that, yes. That's what we would say. I think I don't have a problem with saying it's the least important factor. I think we may have said that in the district court, too. So I don't think it's determinative, but none of these factors are determinative since it's a totality of the circumstances test. And even if it gets little weight, that one factor, it still weighs in our favor. Before you sit down, maybe to save people some time, I think the cross-examination that everyone's looking for, I think it's in the Record of Appeal at Volume 3, 49 to 50. I'll take a look. Thank you. And I thank my law folks for finding that. Okay. All right. Thank you all. Appreciate it. Thank you. Give her a minute, please. It cannot be the case that adjusting trial strategy to account for a bad pretrial ruling for your case waives that issue for all time. Certainly we see that with Miranda cases. You have to adjust for the fact that your client has admitted something, but that doesn't mean that later on we can't appeal that decision to this court. And then the district court never took into account how suggestive the show-up was. It's a circular thing, right, because he's given this one person and is asked, is this him? And he says yes, but there's nothing to differentiate that man from any other person because at that point we don't know if he's the person who pursued him. And the fact that Sergeant Whitten said he had a yellow sweater that was discarded is not a question that goes to the reliability of Mr. Quiroga's identification. Thank you. Thank you, counsel. Case is submitted.